**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Najib A. Hodge,

Plaintiff,

v.

NAPA Genuine Auto Parts, et al.,

Defendants.

No. CV-25-02242-PHX-JAT

**ORDER**

Pending before the Court is Defendant DoorDash, Inc.'s ("DoorDash") Motion to Compel Arbitration and Stay Proceedings (Doc. 29). Plaintiff Najib A. Hodge filed a Response in Opposition to DoorDash's Motion (Doc. 38), and DoorDash filed a Reply (Doc. 39). The Court now rules.

I.    **BACKGROUND**

**A. Factual Background**

DoorDash is a technology company that facilitates the ordering and delivery of food and other goods through its online platform, which connects consumers, various merchants, and independent contractor delivery providers ("Dashers"). (Doc. 29-1 at 2 ¶ 4).

Plaintiff alleges that while working as a Dasher on February 22, 2024, he was at a NAPA Auto Parts store as part of a delivery facilitated by DoorDash when a NAPA employee exited the restroom and said to Plaintiff, "You look like what just came out of me in the toilet." (Doc. 11 at 4). Plaintiff alleges this comment was a racial slur. (Doc. 11 at 7; Doc. 15 at 2–4). Plaintiff further alleged that after he reported the incident to

DoorDash, he "was removed from the assignment and experienced a drop in delivery opportunities." (Doc. 11 at 5).

### B. Procedural Background

On September 10, 2025, Plaintiff filed an Amended Complaint (Doc. 11) alleging claims of public accommodation discrimination and negligent supervision against Defendants NAPA Genuine Auto Parts ("NAPA"), and claims of contractual discrimination, retaliation, and breach of good faith and fair dealing against DoorDash. (Doc. 11 at 7–8; Doc. 15 at 4–6).

On December 29, 2025, default was entered against NAPA. (Doc. 26). The Court later issued an Order denying Plaintiff's motion for default judgement and instructing both parties to "acknowledge that this is not a single Defendant case" in future filings. (Doc. 30 at 2 n.1).

On January 22, 2026, DoorDash filed a Motion to Compel Arbitration and Stay Proceedings. (Doc. 29). In support of Defendant's Motion to Compel Arbitration, Defendants attached a Declaration from Shawn Master (the "Declaration"), the Manager of Integrated Marketing and Dasher Expansion for DoorDash since 2021. (Doc. 29-1 at 1 ¶ 2). Plaintiff filed a Response (Doc. 39), and DoorDash filed a Reply (Doc. 39).

### C. The Declaration of Shawn Master

In the Declaration, Master avows that he has personal knowledge of "independent-contractor-facing business operations, DoorDash's business model, and DoorDash's operating systems," and that he has access to and personal knowledge of data discussed in the Declaration, which "is maintained in the regular course of DoorDash's business." (*Id.* at 2 ¶¶ 2–3). Master avows that Dashers typically receive delivery opportunities through an app on their smartphone or other mobile device. (*Id.* at 2 ¶ 4).

Master then describes the process that Plaintiff had to follow to create a Dasher account in April 2023, including the following screenshot of the sign-up screen Plaintiff would have seen:



(*Id.* at 3–4 ¶ 12).

According to Master, Plaintiff would have had to first enter his postal code on the sign-up screen and then begin the account creation process by tapping or clicking the "Next" button below the postal code field. (*Id.*). According to Master and the attached screenshot, the following statement appeared directly above the "Next" button: "By clicking 'Next,' I agree to the Independent Contractor Agreement and have read the Dasher Privacy Policy." (*Id.*). Master avows (and the screenshot shows) that the words "Independent Contractor Agreement" and "Dasher Privacy Policy" were in red font and hyperlinked to the Independent Contractor Agreement (the "ICA") and Privacy Policy in effect at that time. (*Id.*). Master avows that business records indicate Plaintiff created a Dasher account on April 27, 2023 by entering his postal code and then selecting the "Next" button on the Dasher account sign-up page. (*Id.* at 3 ¶ 11, 4 ¶ 14).

Master further avows that when DoorDash updated its ICA on February 12, 2024,

"DoorDash notified existing Dashers of the updated ICA via a pop-up notification visible upon logging into the Dasher app on or after February 12, 2024." (*Id.* at 5 ¶ 15). Master avows that business records indicate Plaintiff agreed to the February 2024 ICA on February 21, 2024. (*Id.*). According to Master, when Plaintiff logged into the Dasher app on that date, the pop-up notification containing the updated ICA appeared on his screen, and he was required to check a box next to the statement, "I have read, understand, and agree to the Independent Contractor Agreement." (*Id.*). Master avows that Plaintiff "could not continue using the Dasher app unless he checked the box acknowledging the agreement and clicked 'Agree' to agree to the updated terms contained in the February 2024 ICA." (*Id.*). Master referenced the following screenshot of what Plaintiff would have seen when he logged into the app in February 2024:



(*Id.* at 6 ¶ 15).

Master also avows that when DoorDash updated its ICA on November 19, 2024, DoorDash again notified existing Dashers of the updated ICA via pop-up notification visible upon logging into the Dasher app on or after November 19, 2024. (*Id.* at 6 ¶ 16). Master avows that business records indicate Plaintiff agreed to the November 2024 ICA on December 3, 2024. (*Id.*). According to Master, when Plaintiff logged into the Dasher app on that date, the pop-up notification containing the updated ICA appeared on his screen, and he was required to check a box next to the statement, "I have read, understand, and agree to the Independent Contractor Agreement." (*Id.*). Master avows that Plaintiff

"could not continue using the Dasher app unless he checked the box acknowledging the agreement and clicked 'Agree' to agree to the updated terms contained in the November 2024 ICA." (*Id.*). Master referenced the following screenshot of what Plaintiff would have seen when he logged into the app in December 2024:



(*Id.* at 7 ¶ 16).

Master avows that all Dashers, including Plaintiff, have the opportunity to opt out of the arbitration provision in the manner set forth in the arbitration provision, which states that new Dashers may opt out of the arbitration provision within thirty days after agreeing to the ICA by mailing a signed letter to DoorDash indicated that they wish to opt out. (*Id.* at 7 ¶ 17; *id.* at 19–20). Master avows that DoorDash maintains records of all opt outs in

an electronic file in DoorDash's regular course of business, and that DoorDash's business records do not indicate that Plaintiff attempted to opt out of the arbitration provision at any time before filing his Complaint. (*Id.* at 7 ¶ 17, 8 ¶ 18).

## II.    DISCUSSION

"The Federal Arbitration Act (FAA) requires district courts to compel arbitration of claims covered by an enforceable arbitration agreement." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022); 9 U.S.C. §§ 2, 3. "The FAA limits the role of the judiciary 'to determining (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue.'" *Johnson v. Walmart Inc.*, 57 F.4th 677, 680 (9th Cir. 2023) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).

Here, Plaintiff contests the existence of a valid agreement to arbitrate, not the scope of any such agreement. (Doc. 38 at 12). Plaintiff also argues that even if a valid agreement existed, arbitration is improper because there is another defendant in this case, NAPA Genuine Auto Parts ("NAPA"). (*Id.* at 3, 13–14).[1] The Court will first address whether a valid arbitration agreement exists, and if so, whether compelling arbitration is appropriate despite the presence of another defendant.

### A.  Arbitration Agreement

It is well-established that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citation omitted). As such, when courts are asked to compel arbitration of a dispute, the "threshold inquiry is

---

[1] Plaintiff additionally argues that DoorDash's Motion to Compel Arbitration is procedurally improper because the Court's October 8, 2025 Screening Order (Doc. 15 at 7) ordered DoorDash to "answer or otherwise respond" to the operative complaint. (Doc. 38 at 4). Although a motion to stay proceedings pending arbitration "is not expressly included in the list of defenses that extend the amount of time necessary to file an answer to a complaint," the district court has authority to hear a motion to stay in lieu of an answer. *See Romo v. State Farm Fire & Cas. Ins. Co.*, No. CV-24-00544-TUC-RM, 2025 WL 1380476, at *1) (D. Ariz. May 13, 2025); *see Ellison Framing, Inc. v. Zurich Am. Ins. Co.*, 805 F. Supp. 2d 1006, 1012 (E.D. Cal. 2011) (compiling cases where district courts permitted a party to file a motion to stay in lieu of an answer). Accordingly, the Court will exercise its discretion to resolve DoorDash's Motion to Compel Arbitration prior to requiring DoorDash to file an answer to Plaintiff's Complaint.

whether the parties agreed to arbitrate." *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754 (9th Cir. 1988).

As the party seeking to compel arbitration, DoorDash "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Johnson*, 57 F.4th at 681. DoorDash argues that when Plaintiff signed up to be a Dasher in April 2023, he agreed to the terms of the ICA, which contains a mutual arbitration provision (the "Arbitration Agreement"). (Doc. 29 at 2; Doc. 29-1 at 17). DoorDash asserts that the Declaration of Shawn Master details Plaintiff's assent to the ICA and the Arbitration Agreement. (Doc. 39 at 2). Additionally, DoorDash argues that Plaintiff subsequently agreed to two updates to the ICA in February 2024 and December 2024. (*Id.* at 5–6; Doc. 29 at 2).

Plaintiff argues that there is no valid and enforceable arbitration agreement. (Doc. 38 at 3, 12). Specifically, Plaintiff argues that the Declaration is inadmissible and cannot be used as evidence to prove the existence of the Arbitration Agreement because it "relies on generalized system descriptions rather than personal knowledge of Plaintiff's experience." (Doc. 38 at 3, 5–6); *see* Fed. R. Civ. P. 56(c)(4). Plaintiff further argues that the Declaration "fails to establish actual notice" or "meaningful assent." (Doc. 38 at 3, 6). The Court will address each argument in turn.

i.    Admissibility of The Declaration of Shawn Master

"It is permissible to consider evidence outside the pleadings when resolving a motion to compel arbitration. To the extent there are conflicts in the evidence submitted by the parties, the court applies a standard similar to that applicable for a motion for summary judgment." *Scott-Ortiz v. CBRE Inc.*, 501 F. Supp. 3d 717, 721 (D. Ariz. 2020) (cleaned up). For evidence to be admissible under Federal Rule of Civil Procedure 56(c)(4), a "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

As for the personal knowledge requirement, "a witness has personal knowledge only

when testifying about events perceived through the physical senses or when testifying about opinions rationally based on personal observation and experience." *De La Torre v. Merck Enters., Inc.*, 540 F. Supp. 2d 1066, 1075 (D. Ariz. 2008). Federal Rule of Evidence 602 provides that "[e]vidence to prove personal knowledge may consist of the witness's own testimony." *Id.* In the Ninth Circuit, "[p]ersonal knowledge may be inferred from a declarant's position." *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000).

Master has been the Manager of Integrated Marketing and Dasher Expansion for DoorDash since 2021. (Doc. 29-1 at 1 ¶ 2). Master states that because of his role and tenure at DoorDash, he has "knowledge of independent-contractor-facing business operations, DoorDash's business model, and DoorDash's operating systems," as well as "access to, and personal knowledge of," data from which the information in the Declaration was derived—including information about Plaintiff's account. (*Id.* at 1–2 ¶¶ 2–3).

Master's job title and description of his duties are sufficient to establish his personal knowledge of the steps a Dasher must take (and the screens Dashers must encounter) when signing up for a Dasher account and using the Dasher app. *See, e.g.*, *S.S. ex rel Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1046 (S.D. Cal. 2021) ("Plaintiffs argue Mr. Feinberg failed to lay a proper foundation . . . [because] Mr. Feinberg has disclosed nothing that suggests he has personal knowledge regarding Mr. Stern's purported acceptance of the Terms of Service. However, Mr. Feinberg's two declarations establish that (1) he has personal knowledge as to when Mr. Stern registered for a Peloton account; (2) when users undertake a registration, they must accept Peloton's Terms of Service; and (3) Peloton maintains users' account information related to that process, including whether they accepted the required legal agreements. Thus, Plaintiffs' objection that Mr. Feinberg failed to lay a proper foundation is also OVERRULED." (cleaned up)); *Grice v. Uber Techs., Inc.*, No. CV 18-2995 PSF (GJSx), 2020 WL 497487, at *9 (C.D. Cal. 2020) ("Gabriel's and McKelvy's statements are based on their personal knowledge and experience of the registration process for the Uber App as a senior software engineer and product manager at Uber, respectively."); *Williams v. Experian Info. Solutions Inc.*,

No.CV-23-01076-PHX-DWL, 2024 WL 3876171, at *8 (D. Ariz. Aug. 20, 2024).

Furthermore, the Court finds that the Declaration is sufficient to establish a valid contract. Requiring the declarant to have "personal knowledge of Plaintiff's specific enrollment data, or to validate what Plaintiff saw on his device 'imposes a far greater burden for personal knowledge than what is required.'" *Stone v. Equifax Info. Servs., LLC*, No. 2:24-cv-00195-GMN-EJY, 2026 WL 296610, at *4 (D. Nev. Feb. 3, 2026) (quoting *Oatway v. Experian Sols., Inc.*, No. 2:24-CV-00523-LK, 2024 WL 4879822, at *4 (W.D. Wash. Nov. 25, 2024)).

ii.    Mutual Assent

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman*, 30 F.4th at 855. Under Arizona law, "[f]or a valid contract to exist, there must have been an offer, acceptance of the offer, consideration, sufficient specification of terms so that the obligations involved can be ascertained, and the parties must have intended to be bound by the agreement." *Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1153 (D. Ariz. 2016) (internal citations omitted). "[T]he contract must 'manifest mutual assent, i.e., the parties' intent to be bound.'" *Myers v. Experian Info. Solutions Inc.*, 734 F. Supp. 3d 912, 919 (D. Ariz. 2024). Mutual assent must be "based on objective evidence, not on the hidden intent of the parties." *Hill-Shafer P'ship v. Chilson Fam. Tr.*, 799 P.2d 810, 815 (Ariz. 1990). "Objective evidence includes written and spoken words as well as acts." *Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 212 Ariz. 381, 132 P.3d 825, 828 (2006); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). These principles of contract formation apply with equal force to arbitration contracts formed online. *Berman*, 30 F.4th at 855–56 ("These elemental principles of contract formation apply with equal force to contracts formed online."); *Silva v. Butori Corp.*, No. CV-19-04904-PHX-MTL, 2020 WL 2308528, at *4 (D. Ariz. 2020) ("These principles apply with no less vigor to formation of arbitration contracts.").

"With an online agreement, a determination of mutual assent often turns on whether

a consumer had reasonable notice of the terms." *Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1189 (W.D. Wash. 2024). "[C]ourts confronted with online agreements . . . have devised rules to determine whether meaningful assent has been given. Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856; *see Williams*, 2024 WL 3876171, at *12 n.9 ("Although *Berman* addressed the requirements for proving assent under California and New York law, its analysis is equally instructive here because those states, like Arizona, apply the rule that '[p]arties traditionally manifest assent by written or spoken word, but they can also do so through conduct.'" (quoting *Berman*, 30 F.4th at 855)); *Wang v. Experian Info. Solutions, Inc.*, No. CV-24-00250-TUC-AMM (EJM), 2025 WL 2267749, at *8 n.5 (D. Ariz. Aug. 6, 2025), *report and recommendation adopted*, 2025 WL 2420371 (D. Ariz. 2025) ("Like New York and California law, to form a contract in Arizona requires the parties to manifest their mutual assent to the terms of agreement."); *see also Myers*, 2024 WL 2278398, at *3–5 (applying *Berman* when deciding whether assent existed under Arizona law).

Online agreements can take on many forms, including "browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Keebaugh v. Warner Bros. Entertainment Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024); *Wang*, 2025 WL 2267749, at *7 (quoting *Keebaugh*, 100 F.4th at 1014); *Meyer v. Uber Techs, Inc.*, 868 F.3d 66, 75–76 (2d Cir. 2017).

"Browsewrap" agreements are those "in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Berman*, 30 F.4th at 856. Browsewrap agreements are routinely found unenforceable because they fail to provide sufficient notice. *Id.*; *Keebaugh*, 100 F.4th at 1014; *Nguyen*, 763 F.3d at 1178–70.

"Clickwrap" agreements "require[] users to click on an 'I agree' box after being

presented with a list of terms and conditions of use." *Keebaugh*, 100 F.4th at 1014. "[C]ourts have routinely found clickwrap agreements enforceable." *Berman*, 30 F.4th at 856; *Meyer v. Uber Techs, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) ("'Courts around the country have recognized that [an] electronic "click" can suffice to signify the acceptance of a contract,' and that '[t]here is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement.'" (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016))). "The agreement with the strongest notice is the scrollwrap agreement, where the user must scroll through all the Terms of Service before they can click the mandatory 'I agree' box." *Keebaugh*, 100 F.4th at 1014.

"Sign-in wrap" agreements "fall somewhere between a clickwrap and a browsewrap, 'include a textual notice that a user will be bound by the terms of use either by creating or logging in to an account or by placing an order[,]' but do not require a user 'to review the terms and conditions or otherwise manifest their assent.'" *Saeedy*, 757 F. Supp. 3d at 1189 (quoting *Cavanaugh v. Fanatics, LLC*, 738 F. Supp. 3d 1285, 1294 (E.D. Cal. 2024)); *see Wang*, 2025 WL 2267749, at *8 (concluding that the disclosure, "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy," is a sign-in wrap agreement); *Keebaugh*, 100 F.4th at 1014 (concluding that a sign-in screen that states, "By tapping 'Play,' I agree to the Terms of Service," is a sign-in wrap agreement); *Meyer*, 868 F.3d at 75–76 (describing sign-in wrap agreements as agreements that "notify the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise the user that he or she is agreeing to the terms of service when registering or signing up"); *Williams*, 2024 WL 3876171, at *12 (describing "a webpage that requires a customer to click on a button to complete a transaction and notifies customers that by clicking the button, they assent to certain terms" as a "hybrid" of browsewrap and clickwrap agreements).

There are two classifications at issue here: First, the sign-up screen to create a

Dasher account that Plaintiff would have encountered when he created his account on April 27, 2023 is a sign-in wrap agreement; second, the pop-up notifications for the two updated ICAs that Plaintiff would have seen on February 21, 2024 and December 3, 2024 are clickwrap agreements. (*See* Doc. 29 at 11; Doc. 39 at 5, 6 n.3). As explained below, DoorDash has demonstrated the parties' mutual assent to enter into the arbitration agreement.

### 1. *Reasonably Conspicuous Notice*

There are two aspects to reasonably conspicuous notice: "the visual design of the webpages and the context of the transaction." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025). Both aspects are considered together, meaning "courts should expect that a reasonable internet user is more vigilant in looking for contractual terms when the context of the transaction reasonably implies a contractual relationship." *Id.* Courts have found that a contractual relationship is reasonably implied when the transaction "'contemplates entering into a continuing, forward-looking relationship' that would be governed by terms and conditions." *Id.* at 710 (quoting *Keebaugh*, 100 F.4th at 1017). "[A] user engaging in a full registration process, as opposed to a one-time purchase, is more likely to expect a continuing relationship that would put her on notice for a link to the terms of that continuing relationship." *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 925 (N.D. Cal. 2024); *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 517 (9th Cir. 2023) (determining that a transaction that requires "a full registration process" reflects "the contemplation of some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship" (internal quotation marks and citation omitted)). Further, "[w]hen downloading an app to one's own device, the prudent internet user necessarily anticipates ongoing access to that app at the user's discretion—at least until the user deletes the app, conditions imposed on the use of the app change, or the user decides to stop" using the app. *Keebaugh*, 100 F.4th at 1020.

Here, to accept work, Dashers download and use a mobile app specifically for Dashers (Doc. 29-1 at 2 ¶ 4), engage in a full registration process (as opposed to a one-time

purchase) to become a Dasher, and enter into a continuing and forward-looking employment relationship. Accordingly, the Court finds that a person who signs up to be a Dasher would expect (or should expect) that their continued engagement with DoorDash as a Dasher would be governed by some terms and conditions. *See Ghazizadeh*, 737 F. Supp. 3d at 926.

With this context in mind, the Court turns to the visual placement of the notice. "To be conspicuous, notice 'must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Keebaugh v. Warner Bros. Entertainment Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Berman*, 30 F.4th at 856). "Courts look to 'the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design' in determining 'whether a reasonably prudent user would have [had] inquiry notice.'" *Myers*, 734 F. Supp. 3d at 920 (quoting *Nguyen*, 763 F.3d at 1177).

In *Keebaugh*, the notice was directly beneath the operative button, used a contrasting font color, and clearly denoted that pressing the operative button constituted acceptance of the terms. 100 F.4th at 1020–21. The hyperlink was conspicuously distinguished from the surrounding text, and the screen was uncluttered. *Id.* at 1021. The Ninth Circuit Court of Appeals determined that these elements "satisfy the visual requirements to provide conspicuous notice that 'a reasonably prudent Internet user would have seen.'" *Id.* at 1020 (quoting *Berman*, 30 F.4th at 856).

The notice on the 2023 sign-up screen is similar to the notice in *Keebaugh*. The notice was directly above the operative "Next" button and stated: "By clicking 'Next,' I agree to the Independent Contractor Agreement and have read the Dasher Privacy Policy." *See Keebaugh*, 100 F.4th at 1020. The text of the notice clearly denotes that "clicking 'Next'" signifies the user's agreement to the ICA. *See Oberstein*, 60 F.4th at 516. The dark font color of the notice contrasts with the white background, and the font size is not unreasonably small. *See id.* Importantly, the "Independent Contractor Agreement" hyperlink is conspicuously distinguished from the surrounding text in bright red,

underlined font, making its presence readily apparent. *See id.*; *Berman*, 30 F.4th at 857 ("Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color . . . which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage."). The sign-up screen is also uncluttered. *See Keebaugh*, 100 F.4th at 1021. Therefore, the Court finds that a reasonable Internet user would have seen the notice and would have been able to locate the Independent Contractor Agreement via the hyperlink.

### 2. *Unambiguous Manifestation of Assent*

Although "merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything," a click of a button can be an unambiguous manifestation of assent "if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858.

Here, prospective Dashers were explicitly advised that "[b]y clicking 'Next,' I agree to the Independent Contractor Agreement." (Doc. 29-1 at 4 ¶ 12). Plaintiff's claims against DoorDash are based on a delivery he was completing as a Dasher. (*See* Doc. 11 at 3). As the Declaration establishes, to sign up to be a Dasher, Plaintiff had to enter his zip code and click "Next," and directly above that button, Plaintiff would have been notified that by clicking "Next," he was agreeing to the ICA. Therefore, the creation of Plaintiff's Dasher account in 2023 was an unambiguous manifestation of Plaintiff's assent to the terms of the ICA, which includes the Arbitration Agreement. *See, e.g.*, *Saeedy*, 757 F. Supp. 3d at 1196 ("Under Ninth Circuit law, text informing a user that, by clicking a button, "you agree" to terms of use provides for unambiguous manifestation of assent."); *Oberstein*, 60 F.4th at 513 ("The language 'By continuing past this page and clicking [the button], you agree to our Terms of Use' clearly denotes 'that continued use will act as a manifestation of the user's intent to be bound.'" (quoting *Nguyen*, 763 F.3d at 1177)).

Moreover, the Declaration establishes that DoorDash updated its ICA on February

- 15 -

12, 2024, and that in order for a Dasher to continue using the app, the Dasher must check a box stating, "I have read, understand, and agree to the Independent Contractor Agreement," and then click "Agree." (Doc. 29-1 at 5–6 ¶ 15). The Declaration establishes that Plaintiff agreed to the updated ICA on February 21, 2024. (*Id.*). Moreover, Plaintiff alleges in the Amended Complaint that he was completing a DoorDash delivery on February 22, 2024 when the alleged incident occurred. (Doc. 11 at 3). The Declaration also established that Plaintiff checked a box agreeing to the November 2024 ICA. Accordingly, DoorDash has established that Plaintiff checked a box agreeing to the updated ICAs and thereby unambiguously manifesting his assent to those terms. *See Berman*, 30 F.4th at 856.

Therefore, a valid and enforceable Arbitration Agreement exists between Plaintiff and DoorDash. Furthermore, because all three iterations of the ICA explicitly delegate the question of arbitrability to the arbitrator, the Court need not make any determinations about which version of the agreement controls or the scope of the agreements. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 ("The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" (quoting *AT & T Techs., Inc.*, 475 U.S. at 649)); (Doc. 29 at 9–11; Doc. 29-1 at 18, 40, 63).

### B. Multi-Defendant Litigation

Plaintiff argues that even if a valid arbitration agreement exists, arbitration is procedurally improper because there is another defendant in this case. (Doc. 38 at 3, 13–14). However, the FAA "requires piecemeal resolution when necessary to give effect to an arbitration agreement." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19–20 (1983); *Chaney v. Berkshire Hathaway Auto.*, No. CV-17-00989-PHX-DGC, 2017 WL 6520662, at *3 (D. Ariz. Sep. 25, 2017).

### C. Motion to Stay

Defendant DoorDash also moves to stay, rather than dismiss, this case during arbitration. (Doc. 29 at 12-13). This request is consistent with recent Supreme Court

guidance that this Court should allow the case to remain open throughout arbitration and thereafter in case either party wishes to petition this Court to confirm, modify, or vacate the arbitration award. *Smith v. Spizzirri*, 601 U.S. 472 (2024).

The Court notes that under 9 U.S.C. § 9, a petition to confirm, modify or vacate an arbitration award is due within one year of when the arbitration award is made. In *Spizzirri* the Court stated,

> The FAA provides mechanisms for courts with proper jurisdiction to assist parties in arbitration by, for example, . . . facilitating recovery on an arbitral award, *see* §9. Keeping the suit on the court's docket makes good sense in light of this potential ongoing role, and it avoids costs and complications that might arise if a party were required to bring a new suit and pay a new filing fee to invoke the FAA's procedural protections. District courts can, of course, adopt practices to minimize any administrative burden caused by the stays that §3 requires.

*Spizzirri*, 601 U.S. at 478. This language seems to instruct this Court to leave this case open through the time to petition to confirm, modify or vacate. This result will require many cases to sit open on the Court's docket for potentially years for the arbitration to be completed, followed by another year for a hypothetical petition to confirm, vacate or modify that never comes. The Court finds this approach inconsistent with the Civil Justice Reform Act which sets an expectation that this Court will resolve civil cases within 18 months of when they are filed. *See* 28 U.S.C. § 473(a)(2)(B) (district courts should have cases to trial within eighteen months of when they are filed). Nonetheless, it is the approach the Supreme Court appears to envision.

Notably, some other district courts have engaged in a practice of administratively closing cases, and this Court has occasionally done the same in rare circumstances. However, stays pending arbitration will now be widespread, and the procedural mechanism of an administrative closure is not found in the Federal Rules of Civil Procedure, and is not consistent with Federal Rule of Civil Procedure 58 which requires that every civil case conclude with a judgment. In this Court's view, for this Court to undertake a routine practice of "administrative closures", at minimum a general order approving such a practice

seems desirable. Moreover, eventually this Court must enter a judgment for Plaintiff to have the ability to appeal this Order compelling arbitration. *Dees v. Billy*, 394 F.3d 1290, 1294 (9th Cir. 2005) ("We therefore hold that a district court order staying judicial proceedings and compelling arbitration is not appealable even if accompanied by an administrative closing."). This Court is unclear what other "practices" the Supreme Court envisions this Court adopting to "minimize administrative burdens."

Conversely, *Spizzirri* does not technically define the language in its holding that the case must be stayed "pending arbitration." An argument could be made that such language means until the date of the award, at which time arbitration would no longer be "pending." This approach would at least cut a year off the time this case must be open. However, the above quoted language from *Spizzirri* hints against such an interpretation, so the Court will not adopt this interpretation even though it seems more consistent with the Civil Justice Reform Act.

Given that this case must remain open on this Court's docket, taken together with the requirements of the Civil Justice Reform Act, in this Court's view, this Court now maintains a duty to ensure the arbitration proceeds expeditiously. *See Henderson v. Duncan*, 779 F.2d 1421, 1423 (9th Cir. 1986) (recognizing the public's interest in expeditious resolution of cases and the Court's duty to manage its docket). Thus, the Court will require periodic status reports and take an active role in monitoring the progress of the arbitration proceedings. If at any point the Court determines that either party is not expeditiously pursuing arbitration consistent with the Civil Justice Reform Act, the Court will entertain sanctions up to and including dismissing this case.

### III. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant DoorDash's Motion to Compel Arbitration and Stay Proceedings (Doc. 29) is **granted**. Plaintiff and Defendant DoorDash must expeditiously proceed to arbitration. Plaintiff's claims against Defendant DoorDash (only) are stayed pending further order of this Court.

**IT IS FURTHER ORDERED** that Plaintiff and Defendant DoorDash shall file a joint status report, which includes the date of arbitration, by May 29, 2026.

**IT IS FURTHER ORDERED** that, consistent with the Order at Doc. 30 and consistent with the above acknowledgement that this case will proceed on a piecemeal basis, by April 29, 2026, Plaintiff shall either move for entry of default judgment against Defendant NAPA Genuine Auto Parts or file a status report regarding this Defendant only.

Dated this 18th day of March, 2026.

James A. Teilborg
Senior United States District Judge